# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KENYA REED, on behalf of KENT DAVIS (Deceased), | ) ) ) **No. 16 CV 11133** |
| Plaintiff, | ) ) ) |
| v. | ) **Magistrate Judge Young B. Kim** ) ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | ) ) ) ) **August 11, 2017** |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER

Kenya Reed brings this lawsuit on behalf of her deceased father, Kent Davis, challenging the Commissioner of Social Security Administration's final decision denying in part Davis's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Davis claimed that beginning in 2008 he was disabled by a combination of pancreatitis, diabetes mellitus, hypertension, and left shoulder pain. An administrative law judge ("ALJ") agreed that these conditions were disabling, but only as of July 7, 2014, four months before Davis passed away. When the Appeals Court declined to review the ALJ's assessment of the disability onset date, Reed brought this action seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Reed's motion is denied and the government's is granted:

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted as the named defendant.

## Background

Davis filed his applications for SSI and DIB in March 2010, claiming a disability onset date of September 15, 2008. (A.R. 379-89.) After his claims were denied initially and upon reconsideration, (id. at 198-201), Davis sought and received a hearing before an ALJ. That hearing took place on October 17, 2011, and almost two years later an ALJ issued a decision concluding that Davis was not disabled. (Id. at 205-20.) After Davis sought review from the Appeals Council, it issued an order vacating the ALJ's September 2013 decision and remanding the case for an ALJ to gather additional evidence regarding his impairments and directing the ALJ to give further consideration to the opinion of state agency consulting physician Dr. Young-Ja Kim and other evidence.[2] (Id. at 226-30.) On remand, the new ALJ assigned to the case held a second hearing on February 26, 2015. (Id. at 44.) Because Davis passed away three months before the second hearing, his daughter Reed appeared and testified at the hearing on his behalf. On July 31, 2015, the ALJ issued a partially favorable decision finding that Davis's impairments became disabling as of July 7, 2014. (Id. at 35-36.) When the Appeals Council denied Reed's request for review, (id. at 1-6), the ALJ's partially favorable decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Reed timely filed this lawsuit seeking judicial review, *see* (R. 1); 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, *see* (R. 7); 28 U.S.C. § 636(c).

---

[2] Dr. Kim is not related in any way to the assigned judge.

**Facts**

Up until December 2007, when he lost his job because of a factory closure, Davis worked full time as a robotic technician, maintenance technician, and welder. (A.R. 102-04.) After a period of unemployment, in 2009 he began working for 20 hours a week, and then 13 hours a week, as a pantry coordinator with a government-funded food program. (Id. at 110-11.) Reed asserts that beginning in 2008, at the age of 54, her father's health problems prevented him from engaging in work on a full-time basis. During the February 2015 hearing, Reed presented medical and testimonial evidence in support of Davis's claim. That evidence includes the transcript of Davis's testimony from the initial hearing in October 2011.

**A.     Medical Evidence**

The medical record demonstrates that beginning in 2006 Davis had a number of emergency room visits and hospital admissions related to acute pancreatitis, hypertension, and uncontrolled diabetes mellitus. Notes from a hospital admission in March 2008 reflect that Davis had been a heavy drinker for 12 years, but that after being diagnosed with alcoholic pancreatitis 6 years previously, he had only been drinking occasionally. (A.R. 540.) Davis had also been diagnosed with diabetes mellitus and hypertension. (Id.) His March 2008 hospital admission followed four days after Davis had drunk alcohol and after he had run out of medications, when he began experiencing epigastric pain and nausea. (Id.) Four days after his admission Davis checked himself out of the hospital against medical

advice because he was concerned about matters at home. (Id. at 660.) Davis was readmitted to the hospital just over two weeks later, complaining of chest, low-back, and flank pain, and this time he stayed for five days. (Id. at 531.)

In November 2008, two months after Davis's alleged disability onset date, Dr. Joseph Youkhana performed an internal medicine consultative examination. (Id. at 605.) Dr. Youkhana noted that Davis had been hospitalized four times since 2002 to deal with fluctuating blood sugar. (Id.) Davis reported that he had some numbness in his left leg and decreased sensation in his left foot and thigh, and that his pancreatitis causes constant pain for which he takes Tylenol #3 or Vicodin. (Id.) He admitted that he had smoked a half pack of cigarettes per day for 27 years and that he was a heavy drinker from 2001 until 2004, but stated that at the time of the exam he only drank one beer occasionally. (Id.) Upon examination Dr. Youkhana observed that Davis showed a full painless range of motion and normal gait and grip strength, and that he had an entirely normal ability to grasp and manipulate objects with his fingers. (Id. at 606.) Dr. Youkhana observed some decreased sensation to the touch in Davis's left lower leg, and described his problems as including diabetes, hypertension, chronic pancreatitis, and chronic abdominal pain. (Id. at 606-07.)

In December 2008 consulting physician Dr. Kim filled out a residual functional capacity ("RFC") assessment opining that despite his diabetes with early neuropathy, pancreatitis, and hypertension, Davis retained the capacity to perform medium work with no postural limitations other than some climbing restrictions.

(Id. at 613-20.)   After reviewing the consulting examination report Dr. Kim concluded that Davis was only partially credible because his complaints about difficulty walking and using his hands were not supported by the objective evidence. (Id. at 618.)  The following year consulting physician Dr. Charles Wabner reviewed Davis's files and echoed Dr. Kim's conclusion that Davis could perform medium work, although in Dr. Wabner's opinion there was no evidence to support any postural limitations.  (Id. at 680-81.)

Davis was again admitted to a hospital in June 2009 with acute pancreatitis after complaining of general abdominal pain and vomiting, dizziness, and chest pain.  (Id. at 636, 642.)  Davis reported that he had consumed a bottle of beer two days before his admission and then later he told another doctor he had consumed three cans of beer before the episode started.  (Id. at 655, 660.)  The attending physician wrote that "[t]he patient clearly continues to drink, probably at least 2 to 3 cans of beer daily."  (Id. at 656.)  Davis also reported smoking four to five cigarettes per day.  (Id.)  The physician wrote that Davis's prognosis was guarded and that he was in need of alcohol rehabilitation despite Davis's report that he had "cut down tremendously" on his alcohol intake.  (Id. at 657, 660.)  A CT scan of Davis's abdomen was suspicious for pseudocyst formation in the pancreas and possible focal fatty infiltration of the liver.  (Id. at 673.)

In June 2010 a second internal medicine consultative examination was performed, this time by Dr. Alexander Panagos.  (Id. at 703.)  Davis reported that he had a history of heavy alcohol use but at the time he was only drinking

occasionally at social functions.  (Id.)  He also reported having chronic knee and hip pain for four years that he rated at a level of eight out of ten.  (Id. at 704.) Dr. Panagos noted that Davis did not appear to be in any acute distress, and that he had a full range of motion in all of his joints, including the left hip and knee, with no noted swelling and a normal gait.  (Id. at 704-05.)  Dr. Panagos further noted that Davis's ability to grasp with his fingers and grip was unimpaired on either side.  (Id. at 705.)  Dr. Panagos described Davis's issues as including recurrent attacks of chronic pancreatitis secondary to past heavy alcohol abuse, hypertension, diabetes, and arthritis of the left hip and knee.  (Id. at 706.)

Between the fall of 2011 and May 2013 Davis sought emergency room treatment on multiple occasions, sometimes complaining of pain in his hands or in his left arm and shoulder.  (See, e.g., id. at 759, 771, 801, 836.)  In particular, October 2011 notes reflect that he was having hand spasms similar to an episode he had experienced in January of that year when he was found to be hyponatremic. (Id. at 801.)  An x-ray of his shoulder was normal, (id. at 804), and in January 2012 he was noted to have a normal range of motion and strength without any tenderness, (id. at 773).  On at least two occasions his hospital visits were prefaced by Davis running out of medication.  (Id. at 771, 796.)  In September 2012 Davis went to an emergency room complaining that his hands had been cramping and locking for about a month with increasing frequency.  (Id. at 759.)  In May 2013 Davis was admitted to the hospital for three days after he experienced a week of nausea and vomiting.  (Id. at 847.)  Notes from that visit reflect that he had a

normal range of motion and strength. (Id. at 850.) Davis signed himself out of the hospital against medical advice, and although the doctor discussed with him his risks of mortality and morbidity if he left, Davis insisted on leaving. (Id. at 842.) The notes reflect that at the time he checked himself out Davis's chest pain had resolved but his diabetes was uncontrolled. (Id.)

There is one treatment note in the record from Dr. Whitney Lyn, who saw Davis on September 10, 2013. (Id. at 882.) After listing in her notes Davis's past problems and his current medications, she wrote "no health maintenance records were found." (Id. at 884.) The notes do not include any description of his then-current condition or a treatment plan. (Id. at 882-84.) Three months later, on December 12, 2013, Dr. Lyn signed an RFC form stating that she had seen Davis "every three months since 9/2013," although she noted Davis had been seen in her clinic since April 2012. (Id. at 1005.) Dr. Lyn also wrote "N/A" in response to a question asking her to describe Davis's response to treatment and any response "that may have implications for working." (Id.) Nonetheless, Dr. Lyn opined that Davis could stand for only 20 minutes and walk for less than 2 hours in a given work day. (Id. at 1005-06.) She further opined that Davis had significant limitations with reaching, handling, and fingering that would preclude him from using his hands more than 75% of the time or fingering more than 50% of the time. (Id. at 1006.)

The medical record reflects that beginning on July 7, 2014, Davis was again hospitalized for issues related to diabetes and that this hospitalization marked the

beginning of a rapid deterioration in his health. (Id. at 1069.) In the three months that followed, Davis required nursing-home care and developed pneumonia and other serious, acute health problems. (Id. at 893, 994, 1010.) Davis passed away in November 2014.

## B. Davis's Hearing Testimony

At his first hearing held on October 17, 2011, Davis appeared and described his work history and medical problems to the ALJ. He said that he had been "constantly" hospitalized with bouts of acute pancreatitis even before 2006, and that he was disciplined by his last full-time employer for missing too much work. (A.R. 107-08.) He testified that he quit drinking altogether in July 2010 and that between 2008 and 2010 he drank only on special occasions, and then it would be just one beer. (Id. at 117.) Davis said that although doctors had told him to stop smoking, he still smoked three cigarettes per day. (Id. at 131.) He also testified that in 2009 he started working 20 hours a week as a pantry coordinator at a food program, but that his hours were reduced to 13 hours per week after a funding cut. (Id. at 110-11.)

In describing his medical problems, Davis testified that he could barely lift his arms because of pain and that he had chronic pain in his left shoulder, hip, and knee, and pancreatitis pain at a level of six out of ten every day. (Id. at 120-21, 138.) He said that he was taking three Tramadol a day and also prescription-strength Ibuprofen for his pain, but that it only helped sometimes. (Id. at 121-22.) Davis testified that he could walk for two blocks at most and could stand for three

hours, but that he was able to sit all day. (Id. at 125-26.) He also testified that he had to walk up two flights of stairs to get to his bedroom and that he was able to take a bus to medical appointments, but the stairs prevented him from going out often. (Id. at 126-27, 129.) As for daily activities, Davis testified that he watched television all day and that his daughters came to visit once a week to help with things like grocery shopping and laundry. (Id. at 125-26, 128.) Asked why he considered himself disabled, Davis testified that he could not do a job standing up because of his pain, and that his shortness of breath and hand, leg, and feet cramps prevented him from being able to work full-time. (Id. at 142.)

## C.    Dr. Ashok Jilhewar's Hearing Testimony

At the first hearing the ALJ also elicited the testimony of a medical expert, Dr. Ashok Jilhewar, to provide an opinion about the limiting effects of Davis's impairments. Dr. Jilhewar opined that Davis's most severe impairment was uncontrolled type II diabetes mellitus, but that the only related complication was sensory peripheral neuropathy which could be caused by either diabetes or alcohol intake. (A.R. 144, 146.) If it were the latter, in Dr. Jilhewar's opinion the neuropathy would decrease within two years of alcohol abstinence. (Id. at 147.) Dr. Jilhewar testified that Davis's hypertension might also be related to alcohol, because high blood pressure is associated with alcohol withdrawal. (Id. at 149.) In Dr. Jilhewar's opinion the record did not reflect adequate testing to confirm a diagnosis of chronic pancreatitis, and all of Davis's hospitalizations had been for episodes of acute pancreatitis. (Id. at 153.) He further stated that Davis's

descriptions of flank pain were not consistent with chronic pancreatitis, which manifests in the navel area. (Id. at 168.) According to Dr. Jilhewar, episodes of acute pancreatitis almost always happen because a person has been abstinent but then has a small amount of alcohol. (Id. at 153.) Dr. Jilhewar was of the opinion that if Davis were to completely abstain from drinking alcohol, his acute pancreatitis would improve. (Id. at 163.) Dr. Jilhewar further opined that Davis retained the RFC to perform light work with no postural or upper extremity limitations because the record did not clarify for him how Davis's complaints of left shoulder pain would manifest in limits in his upper extremities. (Id. at 165.)

## D. Reed's Hearing Testimony

Because the second hearing before an ALJ took place on February 25, 2015, several months after Davis's death, Reed appeared and testified on his behalf. Reed testified that she had lived with Davis during her childhood until she was 22 years old, but that she had not lived with him in 15 years. (A.R. 64.) Reed testified that before his death she saw Davis at least twice a month. (Id. at 66.) She testified that Davis was not always able to take care of his personal needs and sometimes took two minutes just to climb down six stairs. (Id. at 67.) Reed testified that she made the decision to place him in a nursing home in August 2014. (Id. at 76.)

## E. The ALJ's Decision

The ALJ applied the required five-step sequence for evaluating disability claims in reviewing Davis's applications for DIB and SSI. *See* 20 C.F.R. §§ 404.1520(a) & 416.920(a). After finding that Davis met the insured status

requirements for DIB through September 30, 2017, at steps one and two of the sequential evaluation process the ALJ determined that Davis had not engaged in substantial gainful activity after his alleged disability onset date and that he had three severe impairments: insulin dependent diabetes mellitus, arthritis in the left hip and knee, and pancreatitis. (A.R. 19-20.) After concluding at step three that none of Davis's impairments met or medically equaled the severity of any listed impairment, the ALJ determined that before July 7, 2014, Davis maintained an RFC to perform light work, including the capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, to sit, stand, and walk for 6 hours in an 8-hour workday, and to frequently kneel, crouch, crawl, and climb ramps or stairs. (Id. at 21-22.) The ALJ further determined that Davis should never have climbed ladders, ropes, or scaffolds and that he needed to have avoided exposure to unprotected heights. (Id. at 22.) Based on that RFC the ALJ determined at step four that until July 7, 2014, Davis maintained the ability to perform his past relevant work as a maintenance mechanic and an arc welder. (Id. at 34.)

The ALJ determined that Davis's RFC changed on July 7, 2014, when the record documents a deterioration in his condition leading to several hospitalizations for several serious acute conditions leading up to his death in November 2014. (Id. at 32-33.) The ALJ concluded that during that period Davis was capable of only sedentary work with several additional limitations, including only frequent manipulation and the need to miss more than one day of work per month. (Id. at 32.) Given that more limited RFC, the ALJ determined that Davis would not have

been capable of performing any of his past relevant work during the four months preceding his death, and that given his age, RFC, education, and work experience, the medical-vocational rules dictated a finding that he was disabled. (Id. at 34-35.) Accordingly, the ALJ concluded that Davis was disabled as of July 7, 2014, but not before. (Id. at 35-36.) The ALJ wrote that Reed would not be eligible for any underpayment of SSI, but that as long as Davis did not have a surviving spouse who met certain conditions, Reed would be the "appropriate party to receive any underpayment arising from any disability insurance benefits that might have been awarded under Title II" for the period between July 7, 2014, and Davis's death. (Id. at 36.)

## Analysis

Reed argues that the ALJ made several reversible errors in concluding that Davis was disabled only as of July 7, 2014, rather than as of his claimed disability onset date, September 15, 2008. Specifically, she argues that the ALJ gave insufficient weight to the opinion of Davis's treating physician, erred in evaluating his RFC, and improperly evaluated his symptom descriptions. This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotation and citation omitted). This court's role is neither to reweigh the evidence nor to substitute its judgment for the ALJ's. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). That said, if the ALJ committed an error of law or

"based the decision on serious factual mistakes or omissions," reversal may be required. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## A.    Symptom Evaluation

Reed argues that the ALJ committed reversible error in discounting her hearing testimony and finding Davis's statements less than fully credible with respect to the period preceding the assigned disability onset date. This court gives an ALJ's assessment of the credibility of a claimant's statements "special deference," overturning that decision only if it is "patently wrong." *Summers v. Berryhill*, No. 16-3849, __ F.3d __, 2017 WL 3048555, at *3 (7th Cir. July 19, 2017) (internal quotations omitted). Although in 2016 the Social Security Administration updated its ruling on credibility to clarify that ALJs must focus on the "intensity and persistence" of a claimant's symptoms rather than the credibility of the claimant's character, the factors an ALJ must weigh remain the same. *See* SSR 16-3p, 2016 WL 1020935, at *14167, *14169-70 (effective March 28, 2016); *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Those factors include, among others, the claimant's daily activities, factors that precipitate or aggravate symptoms, medications and their side effects, and other treatments or methods the claimant uses to relieve symptoms. SSR 16-3p, 2016 WL 1020935, at *14169-70; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). This court's review of the ALJ's weighing of those factors "is extremely deferential," and the standard of review precludes the court from reweighing the facts underlying the ALJ's decision. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).

Here the ALJ gave a number of supported reasons to explain why he discounted Davis's statements regarding the severity of his symptoms. For example, the ALJ faulted Davis for failing to follow his doctors' orders to abstain from smoking and alcohol use, despite the evidence that these behaviors exacerbated his symptoms. (A.R. 30-31.) He noted that Davis's emergency room visits often coincided with his failure to take prescribed medicine or alcohol use.[3] (Id. at 30.) He noted that Davis's records show that he had access to medical care through a public hospital system, but that he saw his primary care doctor—who provided routine and conservative medication treatment—relatively infrequently. (Id.) The ALJ wrote that during the two-hour hearing he observed Davis walking without difficulty and sitting comfortably while remaining focused, and wrote that those observations undercut Davis's statements regarding the severity of his pain. (Id.) The ALJ further observed that Davis's description of flank pain was inconsistent with pancreatic pain, which manifests in the navel area (an observation supported by Dr. Jilhewar's testimony, see id. at 168), and noted that Davis did not describe stomach pain until prompted by his attorney, (id. at 30). The ALJ observed that despite Davis's allegations of neuropathy and tingling, he never complained about those conditions to two of his doctors and that there are several

---

[3]  In her reply brief Reed argues that the ALJ impermissibly failed to analyze whether Davis would have been disabled absent his alcohol use. (R. 21, Pl.'s Reply at 9.) But the ALJ did not find that Davis's alcohol use was material to the disability determination. (A.R. 30.) Rather, he listed as one factor among many in his evaluation of Davis's symptom description the fact that Davis did not follow medical advice to abstain from alcohol and tobacco, despite evidence that alcohol use exacerbated his symptoms. (Id.)

records of doctors' visits in which Davis reported that he had no complaints at all. (Id. at 30-31.)  The ALJ wrote that his treating physicians only performed limited physical exams, reflecting that Davis's complaints to them were less severe than those he presented in support of his applications.  (Id. at 31.)  The ALJ assessed Davis's description of medication side effects but noted that there were no corroborating treatment notes documenting related complaints.  (Id.)  Finally, the ALJ reviewed Davis's daily activities and found that his part-time work from 2012 through part of 2014, his ability to ride the bus to appointments and church, and his ability to clean and make meals, among other things, were more significant than one would expect if Davis's condition were as severe as he alleged.  (Id.)

In her opening brief Reed challenges the ALJ's treatment of Davis's daily activities in the period leading up to July 7, 2014.  (R. 18, Pl.'s Mem. at 15-17.) First she argues that the ALJ erred in characterizing Davis's part-time work with a food pantry as amounting to 20 hours per week, when he testified that at some unidentified date he switched to working only 13 hours per week.  But Davis testified that the shift in his hours was the result of a budget cut rather than any inability on his part to maintain a 20-hour work week.  (A.R. 111.)  Although evidence of part-time work may not be "good evidence of ability to engage in full-time employment," *Vanprooyen v. Berryhill*, No. 16-3653, __ F.3d __, 2017 WL 3097865, at *4 (7th Cir. July 21, 2017), it is nonetheless reasonable for an ALJ to consider the applicant's part-time work in evaluating the severity of the alleged symptoms, *see Lott v. Colvin*, 541 Fed. Appx. 702, 706 (7th Cir. 2013).

Reed also argues that the ALJ's analysis of Davis's daily activities fails to account for how his pain limited those activities or his need to take unscheduled breaks while at work and falsely equates his daily activities with an ability to work full-time. It is true that the Seventh Circuit has repeatedly cautioned ALJs not to equate daily activities with full-time work. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). But here, the ALJ weighed Davis's activities as just one among many factors he gave to support his analysis of the symptom description. And although the ALJ did not include in his discussion Davis's testimony that he took breaks at work or that pain limited his ability to leave his house as often as he would like, those omissions do not render the credibility determination "patently wrong," especially in light of the litany of other reasons the ALJ provided. *See Schreiber v. Colvin*, 519 Fed. Appx. 951, 961 (7th Cir. 2013) (noting that ALJ's credibility assessment can be imperfect but still not patently wrong); *see also Shideler*, 688 F.3d at 312 (upholding ALJ's credibility analysis even though that decision "was not perfect").

Reed also argues that the ALJ's assessment of her testimony should be reversed because, according to her, the ALJ "found [her] testimony credible, but did not account for the limitations she testified to prior to 2014." (R. 18, Pl.'s Mem. at 18.) An ALJ is required to explain a decision to dismiss the testimony of a corroborating lay witness. *See Vanprooyen*, 2017 WL 3097865, at *4. But here Reed's argument overlooks that while the ALJ found Reed "generally credible," he explained that he discounted her testimony because he found it was "not very

probative." (A.R. 23.) That is because Reed acknowledged that she had fairly insubstantial contact with her father in the period leading up to July 7, 2014, limited to once or twice per month. (Id.) The ALJ also found that Reed lacked "very specific knowledge of the claimant's most recent work activity," which further limited the value of her testimony. (Id.) Reed has not suggested in her brief that the ALJ mischaracterized her testimony, or explained why the ALJ should have given it more weight than he did. Accordingly, Reed has not shown that the ALJ committed any reversible error in analyzing her testimony.

## B.    The RFC and Treating Physician Rule

In her briefs Reed argues separately that the ALJ committed reversible error in applying the treating physician rule and in formulating the RFC assessment, but because her arguments on those subjects are intertwined, the court will address them together. Reed argues that the ALJ's assessment of Davis's RFC prior to July 7, 2014, is fatally flawed because it fails to take into account standing, walking, and hand manipulation limitations assessed by Dr. Lyn and supported by the record. (R. 18, Pl.'s Mem. at 13.) Reed further argues that in formulating the RFC assessment the ALJ inadequately supported his decision to give great weight to the medical expert's hearing testimony but only "some weight" to the opinion of Dr. Lyn, who Reed characterizes as Davis's treating physician. (Id. at 10-11.)

Beginning with the latter argument, under the treating physician rule an ALJ is required to give controlling weight to a treating physician's opinion if it is "(1) supported by medical findings; and (2) consistent with substantial evidence in

the record."[4]  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).  If the ALJ

concludes that a treating physician's opinion is not entitled to controlling weight, he

must give "good reasons" for discounting the opinion, after considering factors

including "(1) whether the physician examined the claimant, (2) whether the

physician treated the claimant, and if so, the duration of overall treatment and the

thoroughness and frequency of examinations, (3) whether other medical evidence

supports the physician's opinion, (4) whether the physician's opinion is consistent

with the record, and (5) whether the opinion relates to the physician's specialty."

*Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *see also* 20 C.F.R. §§ 404.1527(c),

416.927(c).  As long as the ALJ articulates his reasons, he "may discount a treating

physician's medical opinion if it is inconsistent" with the opinion of a consulting

physician.  *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).  But if the

reasons the ALJ gives for discounting the limitations assessed by the treating

doctor "are not supported by the record," then the "treating physician's opinion

trumps the conclusions of agency consultants—in particular those who never

examined the claimant."  *Vanprooyen*, 2017 WL 3097865, at *4.

Here the ALJ gave several reasons why he decided to discount Dr. Lyn's

opinion, giving it only "some weight."  (A.R. 29.)  First, the ALJ noted that Dr. Lyn

had reported in December 2013 that she had seen Davis "every 3 months since only

September 2013."  (Id.)  In other words, Dr. Lyn had only seen and examined Davis

---

[4]  The SSA recently adopted new rules for agency review of disability claims
involving the treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819,
at *5844 (Jan. 18, 2017).  Because the new rules apply only to disability applications
filed on or after March 27, 2017, they are not applicable in this case.  (Id.)

one time before she provided her RFC opinion. Reed has not identified any other records demonstrating that Dr. Lyn saw Davis more than once, let alone that she provided on-going treatment. (See R. 18, Pl.'s Mem. at 11-12.) The treating physician rule is meant to prioritize the opinions of treating doctors because they are "assumed to be familiar with a claimant's medical issues over time and can provide a unique perspective." *See Retzloff v. Colvin*, 673 Fed. Appx. 561, 567 (7th Cir. 2016); 20 C.F.R. §§ 404.1527(c), 416.927(c) (noting that treating physicians may have a "longitudinal picture" of a claimant's impairments). Reed has not pointed to any evidence suggesting that Davis and Dr. Lyn had an on-going treatment relationship. Accordingly, the ALJ properly took into account the nature and frequency of the treating—or more accurately, examining—relationship between Dr. Lyn and Davis in deciding to discount Dr. Lyn's opinion.

But even if Dr. Lyn had properly been characterized as merely a one-time examining physician, the ALJ is required to give supported reasons for discounting it beyond the existence of conflicting opinions from the non-examining doctors. *See Vanprooyen*, 2017 WL 3097865, at *5. Here the ALJ discounted Dr. Lyn's opinion after concluding that the limitations she assigned with respect to standing, walking, lifting, carrying, and performing hand manipulations were unexplained and unsupported by objective evidence. (A.R. 29.) The ALJ correctly pointed out that before July 7, 2014, physical examinations were "largely unremarkable from a musculoskeletal and neurological standpoint," (id.), and often reflected that Davis had a full range of motion and strength, (see id. at 773, 850), and negative

neurologic or musculoskeletal symptoms, (id. at 772, 849). Reed points to other record evidence, including Davis's own complaints, to argue that the ALJ improperly overlooked evidence that supported Dr. Lyn's opinion. (R. 18, Pl.'s Mem. at 11.) But as explained above, the ALJ adequately explained his evaluation of Davis's subjective complaints, and contrary to Reed's assertions, the ALJ did not ignore the medical evidence to which she now points. The ALJ acknowledged that Davis sought treatment in 2012 for hand cramps and recognized that he complained of pain and tingling. (A.R. 25-26, 30-31.) Reed has not shown how any of those records support her argument that Davis's periodic complaints of hand spasms or cramps translated into any on-going limitations in his ability to use his hands. The consulting examiner who actually tested Davis's grip strength and finger grasping found that he was unimpaired on either side, even though Davis had complained of finger spasms before that exam. (Id. at 626, 705.) Nothing in the one treatment note attributed to Dr. Lyn addresses hand problems or walking and standing difficulties. (Id. at 882-84.) In fact, that note amounts to nothing more than a list of reported problems and medications, with none expressly tied to issues with walking, standing, or using his hands. (Id.) Reed essentially argues that the ALJ should have weighed the objective and subjective evidence differently than he did, but it is not this court's role to reweigh the evidence or substitute its judgment for the ALJ's with respect to how the conflicting medical opinions should be weighed. *See Pepper*, 712 F.3d at 362; *see also Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir.

2016) (upholding ALJ's decision to discount treating physician's opinion where contradicted by objective medical evidence and subjective complaints).

Reed's best argument with respect to the ALJ's handling of the medical opinions is that she erred in giving great weight to the opinion of Dr. Jilhewar, which dates back to the 2011 hearing, because Davis had degenerative conditions like arthritis that were likely to worsen over time. But the ALJ confronted this weakness in Dr. Jilhewar's assessment, and reasoned that his review of the medical record from the period between 2011 and July 2014 reflected a pattern of complaints and treatment that were similar to Davis's complaints and treatment leading up to Dr. Jilhewar's testimony. (A.R. 30.) The record supports that finding, given that Davis complained of hand spasms and left-arm pain both before and after Dr. Jilhewar's opinion. And as the ALJ observed, hospital notes post-dating Dr. Jilhewar's testimony repeatedly characterize Davis as having a full range of motion, normal strength, and a lack of musculoskeletal or neurologic symptoms. (Id. at 772-73, 849-50, 1082 (noting a full range of motion as late as June 21, 2014).)

Instead of pointing to evidence that would contradict the ALJ's reasoning, Reed points out that Davis died from his impairments and argues that Dr. Jilhewar was therefore necessarily wrong about his assessment of the severity of those impairments. (R. 18, Pl.'s Mem. at 10.) But the ALJ explained why he believed Davis's condition took a turn for the worse in the four months leading up to his death, and the fact that Davis experienced a downward spiral in his health in July 2014 does not preclude the ALJ's conclusion that in the years leading up to that

precipice Davis's limitations were consistent with Dr. Jilhewar's opinion. In evaluating Dr. Jilhewar's opinion the ALJ also considered his familiarity with the longitudinal record leading up to 2011, his ability to observe Davis's testimony before formulating his opinion, his familiarity with the regulatory program, and his well-explained testimony. (A.R. 30.) Because the ALJ gave several supported reasons for his decision to prioritize Dr. Jilhewar's opinion over Dr. Lyn's, and because he properly engaged with the regulatory treating-physician factors, the court disagrees with Reed's argument that the ALJ erred in weighing the medical opinions, or failed to include limitations in the RFC that were otherwise supported by the record.

## Conclusion

For the foregoing reasons, the Reed's motion for summary judgment is denied, the government's is granted, and the final decision of the Commissioner is affirmed.

ENTER:

Young B. Kim
United States Magistrate Judge